UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| TAMIA BANKS, on behalf of herself and all others similarly situated,<br><br>      Plaintiff,<br><br>v.<br><br>COTTER CORPORATION, et al.,<br><br>      Defendants. | No. 4:18-CV-00624 JAR |

**MEMORANDUM AND ORDER**

This matter is before the Court on Plaintiffs' Motion To Remand. (Doc. No. 38). Defendants Cotter Corporation (N.S.L.) ("Cotter"), Commonwealth Edison Company ("ComEd"), and Exelon Corporation and Exelon Generation Company, LLC (collectively "Exelon") responded. (Doc. No. 52). Defendants DJR Holdings, Inc. ("DJR"), f/k/a Futura Coatings, Inc., and St. Louis Airport Authority ("Airport Authority") joined in the brief in opposition to Plaintiff's motion filed by Cotter, ComEd and Exelon. (Doc. No. 53). Plaintiff replied (Doc. No. 59) and Defendants, with leave of Court, filed a surreply in further opposition to remand (Doc. No. 65). The Court held a hearing and heard oral argument on the motion to remand. The motion is now ready for disposition.

    **I.**    **Background**

From 1942 to 1957, uranium ore was processed in association with the Manhattan Project to develop nuclear weapons in a facility in downtown St. Louis City known as the St. Louis Downtown Site ("SLDS"). (First Amended Class Action Petition ("FAP"), Doc. No. 6, at ¶¶ 56, 57). In the late 1940's, the Manhattan Project acquired a tract of land near Lambert Airport

1

known as the St. Louis Airport Site ("SLAPS") to store radioactive waste from the uranium processing operations at SLDS. (Id. at ¶¶ 58, 79). In 1957, "approximately sixty truckloads of contaminated scrap metal, several contaminated vehicles, in addition to miscellaneous radioactive wastes were buried on the western portion of SLAPS adjacent to Coldwater Creek," a tributary of the Missouri River which runs throughout North St. Louis County (Id. at ¶¶ 2, 60). In the 1960's, some of the radioactive waste that had been stored at SLAPS was moved to a storage site on Latty Avenue in Hazelwood, Missouri (the "Latty Avenue Site"), a part of which later became the Hazelwood Interim Storage Site ("HISS"). (Id. at ¶¶ 61, 75). In the late 1960's, Cotter purchased the radioactive waste stored at both SLAPS and the Latty Avenue Site. (Id. at ¶¶ 63, 81). Between 1969 and 1973, Cotter stored, processed and transported radioactive waste at the SLAPS and Latty Avenue sites. (Id. at ¶ 66). In 1973, SLAPS was sold to the Airport Authority. (Id. at ¶ 73). The Latty Avenue Site was sold to Futura Coatings, n/k/a DJR. (Id. at ¶ 76).

Plaintiff Tamia Banks owns property located within the one hundred year flood plain of Coldwater Creek. (Id. at ¶ 8). On April 2, 2018, Plaintiff filed her amended class action petition in the Circuit Court of St. Louis County, Missouri. She alleges that, as a result of the Defendants' collective conduct over several decades, radioactive wastes were released into the environment in and around Coldwater Creek, resulting in the contamination of her home and property, as well as the property of other class members, and leading to various forms of property damage.

Plaintiff asserts state-law claims against Cotter, ComEd, Exelon, DJR, and the Airport Authority for: (1) trespass; (2) permanent nuisance; (3) temporary nuisance; (4) negligence; (5) negligence per se; (6) strict liability/absolute liability; (7) injunctive relief seeking medical monitoring; (8) punitive damages; and (9) civil conspiracy; and against the Airport Authority

only for (10) inverse condemnation; (11) violation of the Missouri State Constitution's due process guarantee; and (12) violation of the Missouri State Constitution's takings and just compensation clause. Plaintiff seeks damages resulting from the loss of use and enjoyment of her property; annoyance and discomfort; damage to her personal property; diminution in the market value of her property; costs and expenses incurred as a result of her exposure to radioactive emissions, including the cost of remediation and relocation; statutory damages under Missouri state law; punitive and exemplary damages; costs and attorneys' fees; and interest on the above amounts. Plaintiff also seeks injunctive relief in the form of medical and scientific monitoring of her home and property, as well as environmental testing, clean-up, and continued medical testing.

On April 18, 2018, Defendants removed the action to this Court on the grounds that Plaintiff's action arises out of the Price-Anderson Act ("PAA"), 42 U.S.C. § 2011 *et seq.*, and that, therefore, the Court has subject matter jurisdiction. (Doc. No. 1). On May 25, 2018, Defendants moved to dismiss Plaintiff's claims. (Doc. Nos. 27, 29, 36, 37).

Plaintiff filed her motion to remand on May 29, 2018, asserting that she has pled only state law causes of action and that her original and amended petitions raise no claims under federal law. (Doc. No. 38). Plaintiff specifically alleges that her claims do not fall within the scope of the PAA because (i) Coldwater Creek is not and never has been a licensed nuclear facility; (ii) Defendants have never received a license to possess, transport, or dispose of any radioactive waste on or in Coldwater Creek; (iii) Defendants did not have a license to dispose of radioactive wastes in Coldwater Creek; (iv) Defendants did not have a license to handle the particular materials they handled as alleged herein, including enriched thorium; and (v) Defendants have never entered into an indemnification agreement with the United States

government under 42 U.S.C. § 2210 with respect to the complained activities. (FAP at ¶¶ 14 A-E).

On June 14, 2018, the Court granted Plaintiff's motion to stay Defendants' motions to dismiss pending resolution of her motion to remand and stayed proceedings for sixty days. (Doc. Nos. 51). Following a hearing on Plaintiff's motion to remand on August 8, 2018, the Court extended the stay until further order of the Court. (Doc. No. 71).

**II.   Legal standard**

Federal courts are courts of limited jurisdiction. Ark. Blue Cross & Blue Shield v. Little Rock Cardiology Clinic, P.A., 551 F.3d 812, 816 (8th Cir. 2009). A federal district court may exercise removal jurisdiction only where the court would have had original subject-matter jurisdiction had the action initially been filed there. Krispin v. May Dep't Stores Co., 218 F.3d 919, 922 (8th Cir. 2000) (citing 28 U.S.C. § 1441(b)). A party seeking removal and opposing remand carries the burden of establishing federal subject-matter jurisdiction by a preponderance of the evidence. In re Prempro Prods. Liab. Litig., 591 F.3d 613, 620 (8th Cir. 2010). Generally, a court must resolve all doubts about federal jurisdiction in favor of remanding the case to state court. In re Prempro, 591 F.3d at 620.

"The presence or absence of federal-question jurisdiction is governed by the 'well-pleaded complaint rule,' which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." Bowler v. Alliedbarton Security Services, LLC, 123 F. Supp.3d 1152, 1155 (E.D. Mo. 2015) (quoting Caterpillar Inc. v. Williams, 482 U.S. 386, 392 (1987). See also Gaming Corp. of America v. Dorsey & Whitney, 88 F.3d 536, 542 (8th Cir. 1996) ("The 'well-pleaded complaint rule' requires that a federal cause of action must be stated on the face of the complaint before the

4

defendant may remove the action based on federal question jurisdiction.") (quoting Caterpillar, 482 U.S. at 392). Because federal law provides that plaintiffs are the "masters" of their claims, plaintiffs "may avoid federal jurisdiction by exclusive reliance on state law." Caterpillar, 482 U.S. at 392.

Even in situations where a cause of action based on a federal statute does not appear on the face of the complaint, preemption based on a federal statutory scheme may apply in circumstances where "the pre-emptive force of a statute is so extraordinary that it converts an ordinary state common-law complaint into one stating a federal claim." Bowler, 123 F. Supp.3d at 1155 (quoting Caterpillar, 482 U.S. at 393). See, e.g., Metro. Life Ins. Co. v. Taylor, 481 U.S. 58 (1987) (where a former employee alleged breach of contract, retaliatory discharge, and wrongful termination of disability benefits in state court complaint, the court held that the former employee's claims were preempted by ERISA; plaintiff's claims were necessarily federal in character; and, therefore, removal under 28 U.S.C. § 1441(a) was proper). "Where a complaint raises issues to which federal law applies with complete preemptive force, the [c]ourt must look beyond the face of the complaint in determining whether remand is proper." Bowler, 123 F. Supp.3d at 1155 (quoting Green v. Arizona Cardinals Football Club, LLC, 21 F. Supp.3d 1020, 1025 (E.D. Mo. 2014)).

As further explained by the Eighth Circuit, the exception to the well-pleaded complaint rule applies where a federal statute provides "an exclusive cause of action for the claim asserted and also set[s] forth procedures and remedies governing that cause of action." Id. (quoting Johnson v. MFA Petroleum Co., 701 F.3d 243, 248 (8th Cir. 2012). Thus, although a plaintiff has only filed state law claims, a court may conclude that the plaintiff has "simply brought a

mislabeled federal claim, which may be asserted under some federal statute." Id. (quoting Johnson, 701 F.3d at 247 (internal quotation marks and citation omitted).

### III. Price-Anderson Act

### A. History

In 1954, Congress enacted the Atomic Energy Act of 1954 ("AEA"), 42 U.S.C. §§ 2011–2281, to encourage private sector development of atomic energy for peaceful purposes under a program of federal regulation and licensing. The Act alone failed to spur private sector entry into the field of nuclear energy due in part to a fear of potentially bankrupting liability absent some limiting legislation. Carey v. Kerr-McGee Chemical Corp., 60 F. Supp.2d 800, 803 (N.D. Ill. 1999) (citing Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 64 (1978)). Thus, in 1957, Congress amended the AEA with the Price-Anderson Act ("PAA"), 42 U.S.C. § 2011 et seq., for the express purpose of "protecting the public and … encouraging the development of the atomic energy industry." Id. (quoting El Paso Natural Gas Co. v. Neztsosie, 526 U.S. 473 (1999)). The PAA had three main features: (i) it established a limit on the aggregate liability of those who undertake activity involving the handling or use of radioactive materials; (ii) it channeled public liability resulting from nuclear incidents to the federal government; and (iii) it established that all public liability claims above the amount of required private insurance protection would be indemnified by the federal government up to the aggregate limit on liability. Id.

Congress continues to build on the PAA's foundation, expanding its scope and functions. Estate of Ware v. Hosp. of the Univ. of Pa., 871 F.3d 273, 278 (3d Cir. 2017) (citing In re TMI Litig. Cases Consol. II, 940 F.2d 832, 852 (3d Cir. 1991)). The Act initially relied on state courts and state law to rule on and govern liability for nuclear accidents. Id. However, amendments to

the PAA in 1966 "provided for the transfer, to a federal district court, of all claims arising out of an extraordinary nuclear occurrence" and brought about greater uniformity of liability determinations while retaining state-law causes of action. Id. The amendments required indemnified entities "to waive the defenses of negligence, contributory negligence, charitable or governmental immunity, and assumption of the risk in the event of an action arising as the result of an extraordinary nuclear occurrence." Id. These provisions were premised on "congressional concern that state tort law dealing with liability for nuclear incidents was generally unsettled and that some way of insuring a common standard of responsibility of all jurisdictions – strict liability – was needed. A waiver of defenses was thought to be the preferable approach since it entailed less interference with state tort law than would the enactment of a federal statute prescribing strict liability." Carey, 60 F. Supp. 2d at 803 (quoting O'Conner v. Commonwealth Edison Co., 13 F.3d 1090, 1095 (7th Cir. 1994)).

The PAA was amended again in 1988 to provide for the removal to federal court of any "public liability action arising out of or resulting from a nuclear incident." 42 U.S.C. § 2210(n). Courts that have considered generally the scope of jurisdiction following these amendments have found that Congress intended to create an exclusive federal cause of action for torts arising out of a "nuclear incident," as defined in the Act. See, e.g., In re Berg Litig., 293 F.3d 1127, 1132 (9th Cir. 2002) (public liability action as "exclusive means" of pursuing a nuclear incident claim); Roberts v. Florida Power & Light Co., 146 F.3d 1305, 1306 (11th Cir. 1998) (PAA creates "exclusive" federal cause of action); Nieman v. NLO, Inc., 108 F.3d 1546, 1553 (6th Cir. 1997) (PAA preempts state law claims and they "cannot stand as separate causes of action"); Kerr-McGee Corp. v. Farley, 115 F.3d 1498, 1504 (10th Cir. 1997) (PAA as the "sole remedy" for claims involving atomic energy production); O'Conner v. Commonwealth Edison Co., 13 F.3d

1090, 1099–1100 (7th Cir. 1994) (noting that "a state cause of action is not merely transferred to federal court; instead, a new federal cause of action supplants the prior state cause of action."); TMI II, 940 F.2d at 854 (noting that "Congress clearly intended to supplant all possible state causes of action when the factual prerequisite of the statute are met."). Although the 1988 amendments to the Act clearly created a "federal cause of action," Day v. NLO, Inc., 3 F.3d 153, 154 n. 3 (6th Cir. 1993), it is a federal cause of action of a "peculiar nature," Heinrich ex rel. Heinrich v. Sweet, 62 F. Supp. 2d 282, 296–97 (D. Mass. 1999). The Act incorporates state law as the substantive rule of decision to govern the federal cause of action, so long as the state law is not inconsistent with the purposes of the Act. Id. (citing 42 U.S.C. § 2014(hh)).

### B. Key provisions

Notably, the structure of the PAA, as set forth in the following provisions, has been described as "complicated," "interlocking," and "us[ing] words in unintuitive ways." Estate of Ware, 871 F.3d at 280. The PAA's jurisdictional provision, 42 U.S.C. § 2210(n)(2), provides in relevant part:

> With respect to any public liability action arising out of or resulting from a nuclear incident, the United States district court in the district where the nuclear incident takes place, … shall have original jurisdiction without regard to citizenship of any party or the amount in controversy …

A "public liability action" is "any suit asserting public liability." Id. § 2014(hh). "Public liability" means (apart from certain exceptions not relevant here) "any legal liability arising out of or resulting from a nuclear incident." Id. § 2014(w).

A "nuclear incident" is defined as:

> any occurrence, including an extraordinary nuclear occurrence, … bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive or other hazardous properties of source, special nuclear, or byproduct material[.]

8

Id. § 2014(q). The PAA does not define the term "occurrence." An "extraordinary nuclear occurrence" is defined as:

> any event causing a discharge or dispersal of source, special nuclear, or byproduct material from its intended place of confinement in amounts offsite, or causing radiation levels offsite, which the Nuclear Regulatory Commission or the Secretary of Energy, as appropriate, determines to be substantial, and which the Nuclear Regulatory Commission or the Secretary of Energy, as appropriate, determines has resulted or will probably result in substantial damages to persons offsite or property offsite … The Nuclear Regulatory Commission or the Secretary of Energy, as appropriate, shall establish criteria in writing setting forth the basis upon which such determination shall be made. As used in this subsection, "offsite" means away from "the location" or "the contract location" as defined in the applicable Nuclear Regulatory Commission or the Secretary of Energy, as appropriate, indemnity agreement, entered into pursuant to section 2210 of this title.

Id. § 2014(j).

The term "byproduct material" is defined in relevant part as "the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content." Id. § 2014(e)(2). The term "source material" means "(1) uranium, thorium, or any other material which is determined by the Commission pursuant to the provisions of section 2091 of this title to be source material; or (2) ores containing one or more of the foregoing materials, in such concentration as the Commission may by regulation determine from time to time." Id. § 2014 (z)(1), (2).

### IV.   Parties' arguments

Relying on a recent opinion from this District, Strong v. Republic Services, Inc., 283 F. Supp.3d 759 (E.D. Mo. 2017), Plaintiff argues that the PAA does not apply to her claims in the absence of an appropriate license or indemnity agreement covering the activities complained of. Without a license or indemnity agreement, there can be no "occurrence," that is, no event at the

site of "licensed activity," that would constitute a "nuclear incident." Without a "nuclear incident," Plaintiff's action is not a "public liability action" and is thus not preempted by § 2210(n)(2). (Doc. No. 39 at 1, 7-12). Plaintiff acknowledges that Cotter was issued a license by the Atomic Energy Commission (AEC) to possess "source material," i.e., uranium, in 1969; however, she contends that this license could not have covered uranium mill tailings because at that time, the definition of "byproduct material" did not include uranium or thorium mill tailings. Plaintiff argues that none of the Defendants herein had an indemnity agreement or license to handle, store or transport hazardous byproducts, such as uranium mill tailings, which Plaintiff alleges were the source of the contamination at issue. (Id. at 12). Plaintiff also argues that applying PAA preemption to her state law claims would violate her constitutional right to Due Process by depriving her of her common law property rights without providing a reasonable alternative remedy. (Doc. No. 39 at 15).

Defendants respond that neither the plain language of the PAA nor its legislative history supports Plaintiff's contention that a license or indemnity agreement is required for federal jurisdiction[1] and that numerous courts have criticized and rejected the same arguments she advances here. (Doc. No. 52 at 1-12). In any event, Defendants contend that Cotter had such a license.[2] (Id. at 9-11). Defendants further respond that PAA preemption of Plaintiff's state law

---

[1] During oral argument, Defendants noted this matter is related to similar lawsuits in this Court, including McClurg v. Mallinckrodt, Inc., No. 4:12-CV-00361-AGF (E.D. Mo. 2012). In McClurg, however, no motion to remand was filed and the parties have not challenged the Court's jurisdiction under the PAA. Thus, McClurg provides no guidance on the issues raised herein.

[2] A copy of the license was submitted as an exhibit to Defendants' opposition to Plaintiff's motion to remand. (See Doc. No. 52-7). Plaintiff agrees the exhibit is a public record that the Court can consider on remand. The License issued in 1969 authorized Cotter "to receive, possess and import the [designated] source material [ ], to use such material for the purpose(s) and at the place(s) designated [ ], and to deliver or transfer such material to persons authorized to receive it in accordance with the regulations" of Title 10 of the Code of Federal Regulations, Chapter 1, Part 40. The License states that the "[a]uthorized place of use" was Cotter's facility located at 9200 Latty Avenue; that the "[m]aximum quantity of source material

10

claims would not violate her due process rights. Citing Duke Power Co. v. Carolina Envtl. Study Grp., 438 U.S. 59, 88 (1978), Defendants assert that rather than abolishing any rights, the PAA "transforms" actions based on state law claims that seek to impose public liability into federal actions and provides a reasonable substitute remedy for the common law or state tort law remedies it replaced. (Doc. No. 52 at 13-14).

In reply, Plaintiff does not dispute that the 1988 amendments to the PAA expanded federal jurisdiction to nuclear incidents not considered "substantial;" rather, she contends that the amendments did not eliminate the Act's licensing/indemnity scheme. Plaintiff asserts that the PAA does not afford protections to private entities and persons engaged in activities without authorization, license or permission contemplated under the Act. (Doc. No. 59 at 4-5). Moreover, the legislative history of the PAA suggests that Congress did not intend to preempt all state law actions involving nuclear energy – just those rising to the level of a "nuclear incident."

Plaintiff submits declarations from Richard Stewart, an "environmental and administrative law expert" (Doc. No. 59-1), and Dr. Marvin Resnikoff, an "expert in nuclear waste transportation, storage and disposal" (Doc. No. 59-2). Stewart opines that the PAA does not apply in this case; Resnikoff opines that the radioactive wastes at issue were mill tailings which by definition were not byproduct material until the passage of the Uranium Mill Tailings Act ("UMTRCA") in 1978. In addition, Plaintiff cites to Envirocare of Utah & Snake River Alliance, 56 N.R.C. 53 (Dec. 13, 2000), to support her contention that the NRC has already determined that the radioactive wastes at issue are not subject to federal regulation. (Doc. No. 59 at 9-10).

---

which [Cotter] [could] possess at any one time under [the] license [was] unlimited"; and that the License would expire on December 31, 1974.

In their surreply, Defendants urge the Court to disregard the declarations of Plaintiff's "experts" because they improperly opine on matters of law and are based on unsupported factual assumptions.[3] (Doc. No. 65 at 2-7). Defendants also argue that Plaintiff's reliance on an NRC staff director decision is misplaced. (Id. at 8-9) Envirocare explicitly pertains to mill tailings, which Plaintiff assumes are at issue, but which Defendants dispute. Further, Plaintiff has not alleged that any part of the process that generated the material at issue in this case involved a uranium mill or that any of the sites at issue contained a uranium mill. (Id. at 9).

V.     **Discussion**

There are numerous conflicting opinions as to whether a license or an indemnity agreement is required for federal subject matter jurisdiction pursuant to the PAA. Several courts, including one in this District, have reasoned that in the absence of a license or indemnification agreement covering the activities which giving rise to the liability alleged, there can be no "occurrence," that is, no event at the site of licensed activity, that would constitute a "nuclear incident." See Gilberg v. Stepan Co., 24 F. Supp.2d 325, 343 (D. N.J. 1998); Heinrich ex rel. Heinrich v. Sweet, 62 F. Supp. 2d 282, 297 (D. Mass. 1999); Joseph v. Sweet, 125 F. Supp.2d 573, 576 (D. Mass. 2000); Samples v. Conoco, Inc., 165 F. Supp.2d 1303, 1321-22 (N.D. Fl. 2001); Irwin v. CSX Transp., Inc., No. 3:10-CV-300, 2011 WL 976376, at *2 (E.D. Tenn. Mar. 16, 2011); Strong, 283 F. Supp.3d 759. Rejecting the contention that the PAA is now so broad as to cover *any* claim of property damage allegedly caused by certain nuclear material, these courts

---

[3] While it is generally improper to raise a new argument in a reply brief, courts may consider such an argument where, as here, the nonmoving party has been given leave to file a surreply to address the new argument, and did so. Etrailer Corp. v. Onyx Enterprises, Int'l Corp., No. 4:17-CV-01284-AGF, 2017 WL 3021496, at *3 (E.D. Mo. July 17, 2017) (citations omitted). As for the declarations, significant portions of Stewart's declaration are legal conclusions that the Court has not considered for purposes of this motion. As for Resnikoff's opinion, assuming the radioactive waste at issue in this case was mill tailings, consistent with the analysis in Strong, it would not be covered under Cotter's license because at the time the license was issued, the definition of "byproduct material" did not include uranium mill tailings.

focus on the original purpose of the PAA, i.e., to protect the public and encourage development of the atomic energy industry by providing certain licensees with a system of private insurance, government indemnification, and limited liability for certain nuclear tort claims. The courts further support their holdings by emphasizing that the word "occurrence" as used in the definition of "nuclear incident" means "that event at the site of the *licensed activity, or activity for which the Commission has entered into a contract,* which may cause damage."

Other courts have concluded that such an interpretation runs counter to the plain language of the PAA as well as the Congressional intent behind the 1988 amendments. See Estate of Ware, 871 F.3d at 283; Acuna v. Brown & Root Inc., 200 F. 3d 335, 339 (5th Cir. 2000); O'Conner v. Commonwealth Edison Co., 807 F. Supp. 1376, 1378 (C.D. Ill. 1992); Carey v. Kerr-McGee Chem. Co., 60 F. Supp.2d 800, 806 (N.D. Ill. 1999); Cotromano v. United Technologies Corp., 7 F. Supp. 3d 1253 (S.D. Fla. 2014). This Court recently addressed the issue in Strong, 283 F. Supp.3d 759, a case involving the same facts, one of the same defendants (Cotter), and addressing virtually identical arguments from both sides. The Court finds the Strong court's reasoning persuasive and agrees that "whether as a matter of statutory construction or the structure and history of the PAA," a license or indemnity agreement is a prerequisite for federal subject matter jurisdiction pursuant to the PAA. Id. at 772.

In Strong, it was alleged that defendants accepted radioactive waste consisting of uranium mill tailings without a license to do so and that the waste had spread to the plaintiffs' family farm. The court held there was no federal subject matter jurisdiction under the PAA without a license or an indemnity agreement. Although the waste originated from the facility of a nonparty (Cotter) that had a license to receive, possess, and import the "source material," Strong held that such a source material license could not be the basis for federal subject matter

jurisdiction, because it did not cover uranium mill tailings. Accordingly, the case was remanded to state court. Id. at 772-74.

In reaching its conclusion that there cannot be a nuclear incident without an applicable license or indemnity agreement, the Strong court was persuaded by the analysis of the PAA and its history in Gilberg, 24 F. Supp.2d 325. Noting that case law did not clarify whether the PAA's jurisdictional provisions operate independently form its indemnification provisions, the court in Gilberg looked to the language of the Act itself. The court found it significant that the PAA's definition of nuclear incident uses "occurrence" together with the clause "including an extraordinary nuclear occurrence," so as to read, "[t]he term 'nuclear incident' means any occurrence, including an extraordinary nuclear occurrence." Id. at 332. The court then reviewed the express definition of an "extraordinary nuclear occurrence," i.e., "any event causing a discharge … from its intended place of confinement in amounts off-site, or causing radiation levels off-site …", and noted that as used in this subsection the term "off-site" means "away from the location or the contract location as defined in the applicable ... indemnity agreement entered into pursuant to § 2210 of this Title." Id. Because of what it termed "the proximity to and interrelationship between the word 'occurrence' and the phrase 'extraordinary nuclear occurrence,' Gilberg concluded, as a matter of statutory construction, that "the occurrence which underlies a 'nuclear incident,' can only be an event at 'the location' or 'the contract location' as that term is defined in an indemnity agreement entered into under § 2210." Id.

The court also examined the legislative history of the PAA, S. Rep. No. 85–296, 1957 WL 5103, at *1817–18 (May 9, 1957), and found implicit in its language[4] that the terms "nuclear

---

[4] IT WAS NOT THOUGHT THAT AN INCIDENT WOULD NECESSARILY HAVE TO OCCUR WITHIN ANY RELATIVELY SHORT PERIOD OF TIME .... THE *OCCURRENCE* WHICH IS THE SUBJECT OF THIS DEFINITION *IS THAT EVENT AT THE SITE OF THE LICENSED ACTIVITY, OR ACTIVITY FOR WHICH THE COMMISSION HAS ENTERED INTO A CONTRACT*, WHICH

14

incident" and "occurrence" are "inextricably intertwined" with "licenses" and "indemnification agreements," suggesting that licenses and indemnification agreements are an integral part of the PAA's statutory scheme. Strong, 283 F. Supp. 3d at 770–71.

The Strong court went on to reject the defendants' argument that Cotter's 1969 Source Material License – the same license at issue in the instant case – applied to the plaintiff's claims. Id. at 772. The court reasoned that in 1969 when Cotter received the license, and in 1973 when the defendants allegedly accepted the material at issue, the definition of "byproduct material" did not include uranium or thorium mill tailings. It was not until 1978 that Congress amended the definition of "byproduct material" to include uranium and thorium mill tailings. Id. at 772-73 (citing 42 U.S.C. § 2014(e)(2)). Moreover, the Uranium Mill Tailing Radiation Control Act of 1978 ("UMTRCA"), which first included uranium mill tailings in the definition of byproduct material, states that the amendments "shall take effect on the date of the enactment of the Act." PL 95–604 (HR 13650), Nov. 8, 1978, 92 Stat. 3021, Title II - Uranium Mill Tailings Licensing and Regulation Definition, Sec. 208. Based on this analysis, the Strong court concluded that "Cotter's 1969 Source Material License could not have covered uranium mill tailings." Id. at 773.

Here, Defendants argue that Plaintiff's restrictive reading of the definition of "nuclear incident" as an event at "the location or the contract location" as that term is defined in the

---

MAY CAUSE DAMAGE, RATHER THAN THE SITE WHERE THE DAMAGE MAY PERHAPS BE CAUSED. THE SITE MUST BE WITHIN THE UNITED STATES.... ***IT DOES NOT MATTER WHAT LICENSE MAY BE APPLICABLE*** IF THE OCCURENCE IS WITHIN THE UNITED STATES.... THE INDEMNIFICATION AGREEMENTS ARE INTENDED TO COVER DAMAGES CAUSED BY NUCLEAR INCIDENTS FOR WHICH THERE MAY BE LIABILITY NO MATTER WHEN THE DAMAGE IS DISCOVERED, I.E., EVEN AFTER THE END OF THE LICENSE. THAT IS WHY THE DEFINITION OF 'NUCLEAR INCIDENT' HAS THE PHRASE 'ANY OCCURENCE * * * CAUSING BODILY INJURY, SICKNESS, DISEASE, OR DEATH' AND WHY THE DEFINITION OF 'PUBLIC LIABILITY' IS TIED TO ANY LEGAL LIABILITY ARISING OUT OF, OR RESULTING FROM, A NUCLEAR INCIDENT.

Strong, 283 F. Supp. 3d at 770–71.

applicable indemnity agreement entered into pursuant to 42 U.S.C. § 2210 narrows what Congress obviously intended to be a broader term - and effectively nullifies the 1988 amendments. In ascertaining the plain meaning of a statute, the Court relies on established rules of statutory interpretation, looking not only to the particular statutory language at issue, but also the design of the statute as a whole. DeBough v. Shulman, 799 F.3d 1210, 1212 (8th Cir. 2015); United States v. I.L., 614 F.3d 817, 820-21 (8th Cir. 2010) (citations omitted).

According to a Senate report, "[t]he Price–Anderson system is a comprehensive, compensation-oriented system of liability insurance for Department of Energy ("DOE") contractors and Nuclear Regulatory Commission ("NRC") licensees operating nuclear facilities.[5] Under the Price–Anderson system, there is a ready source of funds available to compensate the public after an accident, and the channeling of liability to a single entity and waiver of defenses insures that protracted litigation will be avoided. That is, the [PAA] provides a type of "no fault" insurance, by which all liability after an accident is assumed to rest with the facility operator, even though other parties (such as subcontractors or suppliers) might be liable under conventional tort principles. This "omnibus" feature permits a more unified and efficient approach to processing and settlement of claims, thus allowing quick compensation to the public from the pool of funds set up by the Price–Anderson system." S. Rep. No. 100-70 (1988), U.S. Code Cong. & Admin. News 1988, 1424, 1426-27.

---

[5] The coverage for NRC licensees encompasses activities of commercial nuclear power plants, certain fuel fabrication facilities, and non-DOE reactors used for educational and research purposes. Activities of DOE contractors are covered if they involve "the risk of public liability for a substantial nuclear incident." These contractor activities include nuclear weapons research, development and testing, nuclear energy research and development, and nuclear waste activities. The Act specifies the procedures for determining the amount and sources of compensation available to compensate persons injured as a result of a nuclear incident arising from these activities. Dan M. Berkovitz, Price–Anderson Act: Model Compensation Legislation? - The Sixty–Three Million Dollar Question, 13 Harv. Envt'l. L. Rev. 1, 1–2 (1989) (footnotes omitted).

It is clear that the 1988 amendments were enacted to expand the scope of federal jurisdiction to a broader class of nuclear liability cases than those arising just from extraordinary nuclear occurrences as well as to provide for consolidation of those claims in federal court. However, in light of the PAA's concerns related to liability limitation and indemnification, the Court is not convinced that the 1988 amendments were meant to extend the reach of the PAA to activities not covered by applicable licenses or indemnity agreements. Defendants' construction overlooks the original purposes and framework of the AEA and the PAA - to require those involved in the nuclear industry to obtain licenses and maintain financial protections. When faced with "competing preemption narratives," the Court has the "duty to accept the reading that disfavors preemption." Cook v. Rockwell Int'l Corp., 790 F.3d 1088, 1094 (10th Cir. 2015).

Defendants further argue that Strong did not conclude that Cotter's 1969 source material license could not support jurisdiction under the PAA. Rather, the court merely found that Cotter's license did not cover uranium mill tailings. Here, Plaintiff asserts that Cotter's license authorizing it "to receive, possess and import" uranium did not apply to the uranium mill tailings at issue.[6] Defendants dispute that the material at issue was mill tailings. Like in Strong, the Court cannot conclude, based on the record before it, that the material was in fact mill tailings. If, as Plaintiff contends, the material is uranium mill tailings, then consistent with the analysis in Strong, Cotter's 1969 Source Material License could not have covered it because at the time the license was issued, the term "byproduct material" did not include uranium mill tailings. 283 F. Supp. 3d at 772-73. Moreover, Defendants have not established that Cotter's 1969 Source Material License authorizing it "to receive, possess and import" uranium covered their activities

---

[6] The Court notes that Plaintiff's amended complaint does not specifically allege the material at issue was uranium mill tailings. (See FAP at ¶ 89) ("[t]he radioactive contamination that has polluted [Plaintiff's property] and continues to threaten to further pollute [Plaintiff's property] match the waste fingerprint (or profile) of the radioactive wastes generated in the processing of uranium ores in the St. Louis area.").

17

at the sites involved in this case. Thus, Cotter's license does not provide a basis for federal subject matter jurisdiction.

## VI. Conclusion

For all of these reasons, the Court finds that Defendants have failed to meet their burden of establishing federal subject matter jurisdiction for purposes of the PAA and that this matter should be remanded to state court. Given this finding, the Court need not address the merits of Plaintiff's due process argument. Strong, 283 F. Supp. 3d at 774. Finally, because the Court lacks subject matter jurisdiction over this action, Defendants' pending motions to dismiss will be denied without prejudice.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for Remand [38] is **GRANTED** and this matter is **REMANDED** to the Circuit Court of St. Louis County under 28 U.S.C. § 1447(c).

**IT IS FURTHER ORDERED** that Defendants' motions to dismiss [27, 29, 36, 37] are **DENIED** without prejudice to refiling in state court.

Dated this 29th day of March, 2019.

_____
**JOHN A. ROSS**
**UNITED STATES DISTRICT JUDGE**